**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DANA R. DONAHUE,

                 Plaintiff,

v.                                                    No. CIV 06-85 LFG

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

                 Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Dana R. Donahue ("Donahue") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner").  The Commissioner determined that Donahue was not eligible for disability insurance benefits ("DIB") or Social Security Income benefits ("SSI").  Donahue moves this Court for an order reversing the Commissioner's final decision, or alternatively, to remand for a rehearing. [Doc. No. 11.]

Donahue was born on October 22, 1963 and was 40 years old when the administrative hearing was held.  [Tr. at 13, 65, 225.]  She completed the ninth grade and later obtained her G.E.D.  [Tr. at 78, 225.]  She had some vocational training as a secretary [Tr. at 178], but primarily worked at restaurants as a server and manager.  [Tr. at 79.]  She states she was employed by Denny's for about

14 years, and worked as a manager the last six months of her employment at Denny's.[1]  [Tr. at 72.]
Donahue is divorced and raised two children on her own.

In late April 2003, Donahue suffered a whiplash injury in a motor vehicle accident where she
was rear-ended.  As a result of the accident, she claims that spinal injuries and related pain throughout
her entire body, along with anxiety, depression and panic attacks, have rendered her non-functioning.
[Tr. at 79, 123.]  She currently lives on food stamps and unemployment benefits.  [Tr. at 114.]

Donahue stated in several of her disability application records that she was either terminated
by Denny's in December 2002 for unspecified reasons but that were not related to her health [Tr. at
72], or that she left her job with Denny's intending to transfer to another city.  [Tr. at 145.]  It does
not appear that Donahue was employed between December 2002 and the date of the motor vehicle
accident on April 28, 2003.  [Tr. at 174.]  Donahue alleges April 28, 2003 as the onset of her
disability.

On June 13, 2003, Donahue filed applications for DIB and SSI.  [Tr. at 65, 216.]  She claimed
she was disabled due to constant headaches, light sensitivity, neck and back pain, and numbness in
her arms, hands, and legs.  Donahue alleged that she was unable to concentrate or remember things.
Her severe headaches and pain prevented her from working.  [Tr. at 71.]  Prior to the motor vehicle
accident, Donahue had no history of emotional or memory problems, chronic pain, or migraine
headaches.  [Tr. at 179.]  Donahue did not have a family practice physician before the accident [Tr.
at 168] and was not hospitalized as result of the accident.  She drove herself to the police station after
the accident to file a police report.  [Tr. at 171.]

---

[1] According to the earnings records, Donahue worked at several Denny's restaurants in different locations,
e.g., San Antonio, Texas and Spartanburg, South Carolina.  She also worked at a JB's Restaurant in Tempe,
Arizona.  [Tr. at 61.]

Donahue's applications for disability benefits were denied at the initial and reconsideration stages, and she sought timely review from the ALJ. An administrative hearing was held on April 28, 2005. [Tr. at 222.] In a written decision, dated September 21, 2005, the ALJ found that Donahue was not disabled within the meaning of the Social Security Act ("the Act") and denied her benefit applications. [Tr. at 13-17.] Donahue challenged this determination to the Appeals Council which denied her request for review on December 6, 2005. [Tr. at 5.] This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]  Here, the ALJ made the determination of non-disability at step five.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor

---

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

reweigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After reviewing Donahue's testimony, medical records, symptoms, and complaints, the ALJ rejected Donahue's claim for benefits at step five, relying on the grids as a framework for the decision and testimony by a vocational expert.  In reaching this decision, the ALJ made the following findings: (1) Donahue met the non-disability requirements for a period of disability and DIB through at least the date of the decision; (2) she had not engaged in substantial gainful activity since the onset of disability; (3) she had severe impairments of cervical strain, depression and panic disorder but they

5

did not meet or medically equal listing requirements; (4) Donahue's impairments could have produced the alleged symptoms but her credibility as to the intensity, duration and limiting effects of those symptoms was in question; (5) Donahue had the RFC to perform light, unskilled work that requires the ability to understand, remember, and carry out simple tasks, but does not require working with the public; (6) she was unable to perform her past relevant work; and (7) there were jobs existing in significant numbers in the national economy that Donahue could perform, including positions of house cleaner, laundry worker, and chauffeur. [Tr. at 15-18.] Ultimately, the ALJ concluded that Donahue was not disabled as defined by the Act at any time through the date of the ALJ's decision. [Tr. at 18.]

## Summary of Donahue's Medical Care

Documentation of Donahue's medical history is sparse. She primarily was seen by chiropractors in 2003 and by a few disability services' consultative physicians. There is a single report of an x-ray of Donahue's spine taken after the motor vehicle accident.

No police report is provided as to the April 28, 2003 motor vehicle accident. Donahue reported that she was stopped at a traffic light when a vehicle struck the back of her car going 35 to 45 m.p.h. The force of the collision propelled Donahue's vehicle into the car in front of her. [Tr. at 76, 164.] Donahue received no medical attention at the time of the accident. [Tr. at 171.]

On May 7, 2003, Donahue filled out a personal injury/workers' compensation questionnaire, indicating she suffered from continuous and severe headaches. She was very fatigued and agitated. She complained of middle and lower back pain. She was not sleeping well. On the form, Donahue noted she was unemployed. [Tr. at 174.]

Also on May 7, 2003, Donahue was seen by chiropractors at Lifetime Chiropractic Wellness Center ("Lifetime"). [Tr. at 164.] She complained of acute pain in her neck which she described as

constant and "very limiting" in her daily living activities.  The chiropractor observed that Donahue was unable to sit for any period of time that day.  He could not complete tests because of her pain. He described Donahue's primary complaint as consisting of headaches, along with back and joint pain stemming from the motor vehicle accident.  The record notes that lights and sounds aggravated her condition and that she needed dark and silence.  [Tr. at 164.]

An x-ray report, completed by James Mertz, D.C., notes a facet tropism at L1-2 that was an "unstabling factor" and paraspinal muscular imbalance.  [Tr. at 143.]  It is unclear from this report whether the x-ray reflected abnormalities of the spine.

Donahue continued to be seen by Lifetime regularly through October 2003, but there are no other medical or chiropractic records after October 2003.  Most of the chiropractic records contain short notes of Donahue's subjective complaints along with illegible notes documenting chiropractic treatment.  Donahue's subjective complaints during these visits were consistent.  On May 8, 2003, she complained of pain in her neck and lower back.  [Tr. at 164.]  On May 12, 2003, she had severe headaches, soreness in her neck, shoulders, and lower back.  She complained of dizziness when bending.  [Tr. at 164.]  On May 15, 2003, Donahue stated that her night vision while driving was worse and that headlights blinded her and caused dizziness or disorientation.  Her headaches were constantly present although the intensity varied.  She lost all strength in her arms and suffered from tingling and numbness.  Her headaches prevented her from functioning.  [Tr. at 163.]  On May 16, Donahue noted that she suffered from a hiatal hernia although there are no medical records to confirm this condition.  On May 20, Donahue complained of "popping" in her left shoulder and ribs, and numbness in her arm.  [Tr. at 162.]  On May 23, she said her head was very painful and that she suffered from headaches and a very sore lower back and hips.  [Tr. at 162.]  On May 27, Donahue

7

still complained of headaches although they were not quite as painful as before. Car headlights continued to bother her vision when driving at night. She felt pain in her lower back and hips which wakened her at night. She suffered from weakness in her hands, and tingling and numbness. She tended to drop things when her hands felt numb. [Tr. at 162.]

A June 5 chiropractic record notes that Donahue had driven to Las Vegas, Nevada to pick up her grandson and that she was in a great deal of pain because of the long drive. Her lower back and hips felt painful. Her headaches and neck pain had increased. [Tr. at 161.] On June 6, she felt tightness, right neck pain and had mild difficulty swallowing. [Tr. at 160.] On June 10, she suffered daily from pain in her hips, back and neck. Her arm felt numb at night. Her hips ached.

On June 13, Donahue submitted her applications for DIB and SSI. During a face-to-face interview with disability services, Donahue was observed as having trouble concentrating, talking, sitting and walking. [Tr. at 69.] The interviewer wrote: "I don't know if it was from the medication but she did talk constantly, she complained about all the pain in her hip and neck and she did show some discomfort." [Tr. at 69.] Donahue reported that she had trouble keeping her finances straight and that her sister helped her with her finances.

Donahue filled out a disability report on June 13, noting constant headaches, light sensitivity in her eyes, neck and back pain, numbness in her arms, hands and legs. She could not concentrate well. Donahue stated that she had stopped working on December 28, 2002, when she was terminated for non-health reasons. [Tr. at 72.] She had been getting massages two to three times a week since the accident. [Tr. at 75.] Donahue was taking Glucosamine and other herbal remedies or supplements but no prescription medication. [Tr. at 77.]

8

On June 18, 2003, Donahue was seen by Dr. Ackerman for an Independent Medical Examination that apparently was requested by Lifetime for purposes of obtaining an impairment rating. [Tr. at 171.]  Dr. Ackerman noted that Donahue appeared to be in marked pain.  She weighed 175 pounds and stated she had lost 15 pounds since the accident.  [Tr. 171.]  She had demonstrated a 25% improvement from the chiropractic care.  Donahue's chief complaints continued to be head pain, photosensitivity and neck pain.  She was unable to squat, kneel or bend because she became dizzy.  She reported that she had blacked out on two occasions since the accident.  She was claustrophobic which prevented her from traveling by train or airplane.  She had no interest in hobbies or sports, and she suffered from disturbed sleep.  Other complaints were bilateral hip pain, numbness while sleeping, achiness during the day, left glenohumeral pain, lower back pain, midback pain and numbness in her left hand.  Donahue took only aspirin, Advil or herbal supplements.  She denied allergies to medications and stated she did not go to the doctor usually for anything.

Dr. Ackerman reported that Donahue's mood was flat, that she suffered from mid-stage dysomnia,[11] as well as  restlessness and travel anxiety.  She did not want to be around crowds. Donahue was easily distracted, forgetful and inattentive.  She exhibited six of nine depression indicators.  However, Donahue was able to multitask, forgetting only one component of a 5-stage multitask operation.  Dr. Ackerman's primary diagnosis was headaches with associated neck pain which was complicated by hip pains.  The secondary diagnosis was lower back pain associated with left shoulder bursitis that was complicated by midback pain.  The third diagnosis was depression. Donahue's overall prognosis was fair.  [Tr. at 173.]  Because she was still in the acute phase of care

---

[11]Dysomnia is "partial nominal aphasia."  Dorland's Illustrated Medical Dictionary, 26th ed., p. 412. Aphasia is defined as "defect or loss of the power of expression by speech, writing, or signs, or of comprehending spoken or written language, due to injury or disease of the brain centers."  Id., p. 99.

9

and because her pain was still constant, Dr. Ackerman did not feel she had reached maximum medical improvement and therefore, could not provide a disability rating.  He stated that Donahue would benefit from cervical traction, manipulation, acute physical modalities and mental health counseling.  It is not clear what, if any, of these treatments she pursued.  Dr. Ackerman also noted that he would see Donahue in six months to perform an impairment rating if appropriate.  Although there is later mention of a scheduled appointment with Dr. Ackerman, there is no corresponding report or record. [Tr. at 173.]

A June 24 Lifetime records indicates that Donahue felt a little better.  However, she suffered from lower back pain after a drive to Las Vegas, Nevada.  She had made the trip from Las Vegas to Albuquerque without stopping for a night.  Her neck was sore all of the time, and eyes were still sensitive to light.  She initially denied dizziness but then felt dizzy when standing up after sitting.  [Tr. at 159.]

On July 1, Donahue suffered from neck and shoulder pain with constant headaches.  She believed the herbal supplements were helping alleviate problems with her vision.  [Tr. at 158.]  On July 16, she was in an extreme amount of pain.  The Lifetime record reflects that Donahue's son had slugged her on the right bicep and that her entire right side from the arm to her neck had started to hurt.  Her headaches began immediately, and she had been unable to get out of bed for two days after this incident.  [Tr. at 158.]  On July 17, Donahue still complained of neck and shoulder pain.  She noted numbness in her right arm.  [Tr. at 158.]  On July 157, she denied numbness in her right arm. The record is difficult to read but it states, in part, that one joint was very tender.  [Tr. at 157.]

On August 1, 2003, Donahue filled out a headache questionnaire for disability services.  She stated that she always suffered from headaches (after the accident).  She felt pain in her eyes and

neck.  Every kind of sound bothered her or "freaked her out."  She was sensitive to light and became

nauseated.  [Tr. at 138.]  The pain in her neck, head and eyes was constant and pounding.  Lights,

loud noises and moving in certain ways brought on the pain.  Being in a dark room without any noise

provided her the most relief.  She treated the pain with application of ice to her neck and eyes.  She

sometimes took Ibuprofen but reported no real relief.  Donahue states that she was unable to take

other types of pain medication because of a hiatal hernia.  [Tr. at 138.]

     Also on August 1, 2003, Donahue filled out a Daily Activities form.  Her average day

consisted of doing some household chores, including washing dishes.  On some days, she was able

to do more house work than on others.  She tended to stay in dark rooms.  The light always bothered

her eyes and gave her headaches.  There were no activities that she was able to do now that she used

to do, including bowling, riding motorcycles and four-wheel vehicles, skiing, and working outside.

Donahue reported she could not be around more than two people at once or it "made her crazy."  She

attended doctors' appointments two to three times a week but missed some appointments.  She was

not able to drive herself to the doctor.  Her sister took her shopping and did the banking for Donahue.

Donahue stated she needed assistance in going anywhere because someone else had to drive her.  She

was having difficulties with her memory as well.  Donahue was able to prepare fast food for herself

but did not cook.  [Tr. at 109-110.]  Someone else cooked for her.  She was unable to stand on her

feet  to cook and did not have sufficient patience or concentration to cook.  She watched some

television and slept.  She could not read because reading gave her headaches.  Donahue never used

to watch television but now it was all she could do.  [Tr. at 112.]  She did not socialize or go to

family functions.  Donahue described her day as doing nothing now but sitting with ice, television,

darkness and quiet.  [Tr. at 113.]  She had trouble sleeping because of pain, and she suffered from

numbness in her limbs.  Her head hurt, and she was stiff and sore.  She did not need help with personal grooming because she "would not allow it." [Tr. at 113.]  Donahue could not take care of her personal finances or pay her bills.  She felt hopeless and worthless.

It is unclear who was living with Donahue during this time.  It appears from various records that sometimes her sister and/or son were staying with her.  On this occasion, it seems that a previous younger employee of Donahue's was staying with Donahue to assist her.  [Tr. at 113-14.]

Donahue stated she could not walk one block.  Her hips, back and head hurt.  She did not think she could carry on a conversation.  She did not use any assistive devices and it does not appear that she took any prescription medications.  She stated that she always had two to three good days out of seven when she could at least function, think clearly and move around "pretty good." [Tr. at 116.]  She was always fatigued and could not see well.

On August 2, 2003, Francisco Aceves, a friend filled out a third-party function report.  He had known Donahue for one year.  He stated he spent every day with her, helping her with rehabilitation.  He described Donahue's day as going to doctors' appointments and returning home. [Tr. at 129.]  According to Aceves, Donahue tried her hardest to provide her son with the necessities along with food and shelter.  Donahue took care of pets by checking their food and water and letting them out.  [Tr. at 130.]  Before her injury, she was able to care for herself.  However, her illness affected her sleep, and she was restless, sore and stiff.  She did not have any problems with her personal care.  She did not prepare her own meals.  Aceves prepared meals for her.  Donahue did some yard or house work depending on the level of her pain.  She went out once in a while.  Sunlight affected her vision.  She avoided going out because of anxiety and fear of crowds.  [Tr. at 132.] Donahue was not able to shop or drive.  She did not take care of her personal finances.  She tended

12

to forget to pay bills and misplaced money.  Her hobby was spending time with her grandson but she could not tolerate the drive to Las Vegas, Nevada to pick him up.  [Tr. at 133.]  Donahue talked on the phone with her friends several times a week.  She could not walk far and did not follow instructions well.  [Tr. at 134.]  Aceves described Donahue as being "very jumpy and on edge."  [Tr. at 135.]

On August 5, a Lifetime record notes that Donahue was sore because of having traveled to Las Vegas again.  The drive really aggravated her body.  Her stress levels were very high at this time "(family issues)".  Donahue's lower back was congested and stiff.  All her pain worsened when she drove or sat for long periods of time.  [Tr. at 157.]  On August 27, Donahue reported her middle to lower back was in pain.  When she ate her jaw locked but she had not been diagnosed with TMJ.  She felt that her jaw was out of alignment.  The records notes that Donahue returned her grandson to Las Vegas.  [Tr. at 157.]

On September 19, 2003, Donahue complained of daily dull to sharp pain.  She suffered pain in her lower back and neck.  She reported nausea and light sensitivities.  She was not able to eat and said she had lost 15 pounds since the accident.  She tended to get agitated very quickly.  Donahue had numbness in her left arm and left hip.  The headaches were constant but not as intense.  She marked a box indicating she needed limited assistance with common every day tasks.  [Tr. at 155.]  On September 30, Donahue reported that she was vomiting from the nausea.  She had neck pain and her eyes were not significantly better.  She also stated that she had another appointment with Dr. Ackerman for a disability rating on October 25, but it is not clear whether she saw Dr. Ackerman again.  The Lifetime record indicates that Donahue now had an attorney.  [Tr. at 156.]

13

On October 2, 2003, Donahue reported aching in her middle back.  Her eyes were still sensitive to light.  [Tr. at 152.]  On October 6, she continued to complain of soreness and stiffness in her middle back and between the shoulder blades.  Her left foot was swollen and her ankle hurt.  [Tr. at 152.]  An October 14 records indicates that Donahue was going to see a neurologist but it is not clear whether she did see a specialist.  [Tr. at 152.]  The record also states Donahue was going to see an eye doctor and that her attorney was making appointments for her.  There are no records indicating Donahue saw an eye doctor.  On October 24, Donahue reported daily headaches and light sensitivities.  The record again reports she intended to see an eye specialist to check her eyes and vision.  [Tr. at 151.]

On October 25, 2003, Dr. Murtaza Parekh conducted a consultative exam for disability services.  Donahue's primary care provider was listed as Lifetime Chiropractic.  She complained of daily headaches that lasted all day, occurring from the date of the motor vehicle accident.  Initially, she felt nauseated and was vomiting but those problems had diminished over time.  She reported severe photophobia associated with her headaches that made driving difficult.  She was unable to drive at night.  She also suffered from neck pain that started after the motor vehicle accident.  Donahue had trouble swallowing and felt she was choking when she lay flat.  She was very dizzy.  Her back pain was worse with any prolonged sitting, standing or walking.  She dropped things.  [Tr. at 144.]  Donahue also suffered from memory loss.  She was forgetful since the accident.  She did not take any medications.  She stated she left her job just prior to the accident, intending to transfer to another city.  [Tr. at 145.]

Dr. Parekh noted that Donahue ambulated well up and off the exam table without difficulty and up and out of a chair, again without difficulty.  She was able to dress and undress without

problem.  Her hearing and speech were intact.  Her vision was all right.  Her gait was normal without assistive devices.  Her grip strength was 5/5.  Donahue's fine and gross manipulation were normal. She had normal range of motion at her elbow, wrist and shoulders.  With respect to her cervical spine, she was able to flex 40 degrees but with pain, and she was unable to extend due to concern with pain and photophobia.  Her lumbar flexion was 90 degrees with pain.  She performed the straight leg raise. She was able to walk on her heels and toes and could squat.  She walked heel to toe.  There were no x-rays for the physician to examine.  While neck pain and numbness were noted, Donahue exhibited normal sensation that day.  She reported chronic back pain since the accident.  Dr. Parekh concluded that there were no limitations in Donahue's ability to sit, stand, walk, lift, hear, speak or handle objects.  [Tr. at 146.]  The physician also filled out a medical source statement regarding Donahue's ability to work and marked no limitations in any category.  [Tr. at 148.]

Donahue was seen by Lifetime again on October 28.  She stated she felt all right that day. She complained that after her last visit her headache had lasted all day.  [Tr. at 151.]  On October 30, 2003 (her last recorded visit to Lifetime), Donahue stated that she was exhausted and that she was having her roof repaired.  Her left shoulder was in pain from a seat belt.  [Tr. at 151.]

On December 2, 2003, Dr. Finnegan, a non-examining physician for disability services, noted that Donahue suffered what amounted to a whiplash.  She now experienced headaches and neck pain but no permanent abnormalities had been found to date.  She received chiropractic care but there were no neurological deficits identified.  She exhibited a normal gait.  The only abnormality was decreased extension of her neck.  On physical restrictions had been recommended.  With additional therapy and control of pain with appropriate medications, Dr. Finnegan stated Donahue should

achieve a non-severe status in May 2004.  However, he stated that until then, "consideration is given to her symptoms of pain." [Tr. at 177.]

On December 5, 2003, Donahue's benefit applications were denied. [Tr. at 27.]

In 2004, there are no reported visits to doctors or chiropractors except for a mental health consultative examination conducted on behalf of disability services. On January 11, 2004, Donahue submitted a Reconsideration Report.  Most of her complaints were the same, although there were some new complaints.  She emphasized feelings of stress, panic attacks, rashes on her neck and face, and feelings of paranoia. [Tr. at 95.]  Since filing her initial benefits applications, she had problems with anxiety, nerves, hives, depression, crying spells, paranoia and suicidal feelings.   Under information relating to medical treatment, the only notation is "can't afford."  This form was filled out by a secretary with the law firm representing Donahue.  There is a note on the form stating that Donahue provided the information. [Tr. at 95-98.]  Under Donahue's request for reconsideration, she stated only that she was disabled. [Tr. at 34.]

On February 13, 2004, Donahue filled out another work history report that did not provide any new information. [Tr. at 101.]  Her second headache questionnaire filled out that same day indicates daily headaches and pain in her eyes and back of neck.  Pain in her head, neck, back, hips and shoulders was still present.  Lights, noise and walking brought on the pain.  Dark, quiet rooms helped her.  She stated she was unable to do anything. [Tr. at 139.]

On February 13, 2004, Donahue filled out a second daily activities questionnaire. [Tr. at 119.]  She stated "everything had changed" since the accident.  She had worked 13 years but now could not.  She was unable to drive at night.  She was paranoid to be in a car.  She suffered panic attacks and stayed inside her house mostly.  She could not be crowds.  Her son did everything for her.

16

She did not cook and had difficulties swallowing.  She did limited household chores.  Donahue was unable to read and did not pay attention to television programs.  Some people dropped by to see her but she was only comfortable around her son.  She believed "absolutely everything" changed after the accident and that everything she had worked for she now was unable to do.  [Tr. at 123.]  Her back hurt and her hips ached "terribly."  She was grouchy and moody.  She did not need help with personal care but it took her longer now to shower and shave her legs.  When she washed her hair, she felt dizzy.  Because Donahue had trouble making decisions, her son made them for her.  She was depressed, anxious and suffered from panic attacks which were worse.  She feared the car.  She forgot everything and lived in confusion.  [Tr. at 124.]  She could walk one block slowly but her back bothered her a lot.

On July 8, 2004, Dr. Elizabeth Penland, PhD, provided a consultative mental health examination.  She noted that Donahue was living with her sister and had been in New Mexico for 2 ½ years.  Donahue reported the same symptoms of severe pain and migraines, daily headaches, light sensitivity and pain in back of both eyes.  She suffered from nausea and vomiting.  She had memory problems and could not remember appointments.  Donahue complained of shoulder pain and pain shooting down her spine and back.  She felt off balance and had a choking feeling from her spinal column being pushed forward.  She reported a hiatal hernia because of her esophagus being displaced.  Donahue could not eat solid food because she did not think it would go down her esophagus.  She complained of severe depression and panic attacks stemming from the trauma of the accident.  Donahue had no history of chronic pain, migraine headaches, or memory problems.  [Tr. at 178-79.]  She was claustrophobic and very nervous when around more than one person.  She suffered from

sleep problems and restless leg syndrome.  She was very isolated and had suicidal thoughts every day.
She had even thought of using a gun to shoot herself.

Unless the report contains a typographical error, Donahue reported she had lost 70 pounds
immediately after the accident over a 3-4 month period.  No other record indicates such a significant
loss of weight.  Donahue stated she had severe concentration and memory problems.

Objective testing indicated that Donahue had low to average intellectual functioning that was
at times borderline.  Dr. Penland observed Donahue to have put forth good effort and to have been
cooperative during the testing.  However, Donahue was fatigued and quite anxious.  The overall
scores may have been an under representation of her actual cognitive skills because she was not
feeling well that day.  However, it was difficult to set up this appointment since Donahue had
forgotten the two prior scheduled appointments.  [Tr. at 182.]

Dr. Penland provided these diagnoses: major depressive disorder, single episode severe; panic
disorder; rule out pain disorder; severe neck injury; severe neck pain; hiatal hernia; severe memory
problems; daily migraines; occupational problems related to health problems and chronic pain and
panic disorder and depression [Tr. at 183.]  Dr. Penland stated: "Ms. Donahue would have severe
difficulties in work-related activities."  [Tr. at 183.]

On July 15, 2004, Dr. Gabaldon, a non-examining physician for disability services, provided
an assessment for disability services.  He concluded, based on the record, that Donahue was
moderately limited in attention and concentration and ability to work in coordination with others.  She
was also moderately limited in her ability to interact with the pubic, accept instructions and respond
appropriately to criticism, to get along with coworkers and to respond appropriately to changes in
the work setting.  He did not find her significantly limited in any other category.  He found that

despite her allegations and depression, her  impairment did not appear consistent with the available evidence.  [Tr. at 185.]

On the Mental Capacity Technique form, Dr. Gabaldon noted affective disorders of anxiety, major depression, borderline disorder (re: mental retardation), recurrent severe panic attacks.  He concluded that she had mild limitations in daily living, mild to moderate limitations in social functioning, and moderate limitations in concentration, persistence or pace.  There was insufficient information to determine whether she suffered from repeated episodes of decompensation.  [Tr. at 189-193.]

On July 16, 2004, disability services denied the request for reconsideration.  [Tr. at 26, 30.]

On July 30, 2004, Donahue filled out a disability report form for her appeal.  She provided the same complaints.  However, she refers on this form to having been placed on Zoloft by Dr. Vicks.  There are no corresponding medical records from any physician and no confirmation that Donahue was taking an anti-depressant.  However, she stated she had been seen by Dr. Vicks for social anxiety, severe claustrophobia, panic attacks and depression, and that he tested her for rheumatoid arthritis.  [Tr. at 88-89.]

On August 11, 2004, Donahue filled out the request for an ALJ hearing stating nothing more than "I am disabled."  [Tr. at 28.]  The first ALJ hearing, set for February 7, 2005, was rescheduled as Donahue's attorney was unable to contact her.  [Tr. at 21.]

On April 28, 2005, the ALJ held the hearing, at which Donahue and her legal counsel were present.  [Tr. at 222.]  Donahue testified that she weighed 170 pounds.  She stated that a friend had moved in with her but that she was "by herself."  [Tr. at 225.]  She thought she last worked at Denny's in May 2002, although other records indicate she left or was terminated in December 2002.

Donahue testified that she became unable to work after the April 2003 accident.  She found it difficult to swallow now and her back and head ached.  She stated that everything ached.  [Tr. at 225.]  The chiropractor had been unable to help her.  She felt like she was choking and that there was some sort of pressure when she tried to swallow.  [Tr. at 227.]  Her headaches were constant although the sometimes the degree of pain varied.  She testified that she was unable to do much to relieve the headaches because of the hiatal hernia.  The only relief she could get was to go into a dark, quiet room.  She was asked why the hernia prevented her from taking medications and her response was not entirely clear but she stated that the medicine somehow affected her diet.  [Tr. at 228.]

Donahue reported that her back hurt, but that her hips hurt her even more.  She could not stand or sit for 15 minutes.  It appears that she needed to stand at some point during this short hearing.  Donahue was not able to lift much.  Sometimes she was unable to lift as much as a glass of water.  She had shingles on her neck that occurred three times a year.  [Tr. at 229.]  She awoke from pain every two hours.  She felt anxious and tended to cry.  She did not go anywhere other than to Walmart at 3 or 4 a.m. when the store was not busy.  She was nervous when in the car and tended to get car sick.  She had a problem with depression but could not talk about it without crying.  [Tr. at 230-31.]

A vocational expert testified at the hearing, concluding that Donahue was not able to perform her past relevant semi-skilled or skilled work.  The ALJ provided a hypothetical to the vocational expert including limitations in her abilities to understand, remember and carry out more than simple tasks.  She was limited in her ability to interact with the public.  The ALJ asked the expert if there were any jobs Donahue could perform at the light level with these limitations in mind.  The vocational

expert concluded that Donahue could perform the positions of house keeper, parking lot attendant and possibly a chauffeur.  [Tr. at 234.]

On September 21, 2005, the ALJ issued an unfavorable decision, denying Donahue's requests for benefits.  [Tr. at 13.]

## Donahue's Motion

In this appeal, Donahue argues that the ALJ erred in the following ways: (1) the RFC assessment was not supported by substantial evidence and was contrary to law; (2) the ALJ failed to properly develop the record; and/or (3) the ALJ failed to reconcile inconsistencies between the vocational expert's testimony and DOT vocational information.  [Doc. No. 12, pp. 3-4.]  The Commissioner responds that its non-disability finding fell within the purview of the Act and followed the regulatory criteria.  Moreover, substantial evidence supported the ALJ's decision, which was a correct application of the regulations.  [Doc. No. 13.]

## Analysis

### RFC FINDING

At step five, after the claimant establishes she cannot return to her past relevant work, the burden shifts to the Commissioner to show that the claimant retains the RFC to do other work that exists in the national economy.  Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993).  A person's RFC is what an individual can still do despite her limitations, and it constitutes "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, . . . may cause . . . limitations or restrictions that may affect his or her capacity to do work-related . . . activities."  S.S.R. 96-8p, 1996 WL 374184, at *2.  To determine the RFC, the ALJ assesses the claimant's ability to perform the physical demands of work activity and

21

the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.  S.S.R. 96-8p, 1996 WL 374184, at *7.  The ALJ considers the relevant evidence in the record, medical history, medical signs, laboratory findings, effects of treatment, reports of daily activities, lay evidence, medical source statements, effects of symptoms, and evidence from attempts to work.  Id. at *5.  The ALJ must make every reasonable effort to ensure that the file contains sufficient evidence to assess one's RFC.  Id.

Donahue argues that the ALJ's RFC finding was insufficient, unsupported and contrary to law.  Donahue does not contest the ALJ's RFC findings as to any of Donahue's physical limitations. In her brief, Donahue summarizes some of the evidence concerning alleged physical limitations. Indeed, the vast majority of Donahue's complaints are wholly subjective and without objective support, e.g., headaches, fatigue, agitation, sleeplessness, dizziness, soreness, disorientation, difficulty swallowing, weakness in hands, tingling, numbness, restlessness, paranoia, nerves, stress, and poor memory.  None of these subjective complaints are substantiated by objective, medical evidence.[12] Donahue discusses Dr. Parekh's consultative examination of Donahue and his findings that Donahue had no limitations in her ability to sit, stand, walk, lift, hear, speak or handle objects.  Thus, the physical RFC appears unchallenged, and in any event, supported by substantial evidence.

Donahue, however, clearly challenges the ALJ's RFC finding as to alleged mental impairments or limitations.  Again, the record is replete with Donahue's subjective complaints, but there is no treating mental health care provider who substantiates Donahue's complaints.

---

[12]Chiropractors are not medically accepted sources as defined in the regulations.  20 C.F.R. §§ 404.1513(a).  While a chiropractor's opinion might be used to corroborate a treating physician's opinion, there are no treating physician's reports or opinions in this record.  Moreover, based on a review of the chiropractic treatment records, it does not appear that a chiropractor provided any opinions as to limitations Donahue might have had.

A consultative psychologist's examination and report are the primary evidence in the record concerning Donahue's mental condition. [Tr. at 178.] After examining Donahue and conducting psychological testing, Dr. Penland diagnosed Donahue with major depressive disorder, single episode, severe, without psychotic features, a panic disorder without agoraphobia, and "rule-out pain disorder" associated with both psychological factors and a general medical condition. [Tr. at 183.] Dr. Penland further concluded that Donahue "would have severe difficulties in work-related activities" without specifying what type of work-related activities might be affected. [Tr. at 183.]

In addition, Dr. Gabaldon, a non-examining psychologist, filled out a mental RFC assessment. Dr. Gabaldon found that Donahue was moderately limited in her abilities to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting. [Tr. at 186.] On the Psychiatric Review Technique form, Gabaldon rated Donahue's functional limitations as mild in daily activities, mild to moderate in difficulties in maintaining social functioning, and moderate in maintaining concentration, persistence or pace. [Tr. at 199.]

In determining Donahue's mental RFC, the ALJ relied on Dr. Penland's evaluation and Dr. Gabaldon's evaluation of limitations. [Tr. at 16.] The ALJ stated that while Dr. Penland concluded that Donahue would have severe difficulties in work-related activities, Penland did not say that Donahue would be unable to perform light, simple, unskilled work. [Tr. at 16.] The ALJ further noted that the state agency physician (apparently Penland) did not have the benefit of more recent

evidence, including the claimant's testimony.  The ALJ did not specify what the more recent evidence revealed or how it might have changed Penland's evaluation.

The ALJ also noted that the claimed intensity and persistence of Donahue's pain were not consistent with the medical record as a whole and that no treating doctor had stated that Donahue was disabled.  The Court finds that substantial evidence supports the ALJ's credibility determination regarding Donahue's complaints of pain.

In his written decision, the ALJ found:  "[T]he claimant has the [RFC] to perform light, unskilled work that requires the ability to understand, remember, and carry out simple tasks, but that does not require work with the public."  [Tr. at 16.]  In the hypothetical question presented to the vocational expert at the hearing, the ALJ similarly stated that Donahue would be limited to understanding, remembering and carrying out simple tasks, would have difficulty working with the general public and would require light level physical work.  [Tr. at 233.]

However, in presenting the hypothetical to the vocational expert, the ALJ did not express all of the limitations set forth by the agency's examining and non-examining psychologists.  For example, the hypothetical did not include Donahue's moderate limitation in the area of concentration, persistence or pace.  The ALJ and the VE typically use the language found on the Psychiatric Review Technique Form (PRT) when determining whether a claimant's RFC will permit her to continue working.  *See* Stinson v. Barnhart, 2004 WL 1212048 at *8 (D. Kan. May 21, 2004).  The PRT form uses "slight, moderate, marked, and extreme" in evaluating degree of limitation.  [Tr. at 199.]  The

24

hypothetical, however, did not refer to any degree of limitations and made no specific mention of limitations regarding Donahue's ability to concentrate.[13]

The Court concludes that without a more comprehensive and inclusive hypothetical, the ALJ did not have a complete and meaningful opinion from the VE. Thus, it is unclear if Donahue's RFC does or does not preclude her from performing certain jobs in the economy. In addition, the Court is further concerned that the hypothetical to the VE did not include Donahue's diagnoses of major depression and panic disorder which the ALJ determined were severe impairments. Without consideration of major depression, it is unclear whether the ALJ determined how these conditions might affect her mental RFC. *See also* Wiederholt v. Barnhart, 121 Fed. Appx. 833, 839 (10th Cir. Feb. 8, 2005) (ALJ's improperly failed to include all of the limitations in hypothetical to VE).

The ALJ discounted Dr. Penland's opinion that Donahue would have severe difficulties in work-related activities. However, the question of whether Donahue could perform light, simple, unskilled work was not addressed by Dr. Penland in her report. Notwithstanding Dr. Penland's lack of specificity, the ALJ concluded that since Dr. Penland did not say Donahue could not perform light, simple work there was an inference that Donahue could perform such work.

Penland did not specifically discuss which work-related activities she meant or how she defined work-related activities. While the ALJ's conclusion is logical and quite understandable, it is also impermissible. The ALJ may not rely on the "absence of contraindication in the medical records." Thompson, 987 F.2d at 1491. "The absence of evidence is not evidence. The ALJ's

---

[13]The Social Security regulations also provide that the four mental functioning areas included in the psychiatric review technique form are not an RFC assessment but are used to rate the severity of the mental impairment(s) at steps 2 and 3 of the evaluation process. The mental RFC assessment used at steps 4 and 5 requires a more detailed assessment in the broad categories found in the four criteria from the psychiatric review technique form. S.S.R. 96-8p, 1996 WL 374184, at *4. Upon remand, the ALJ is advised to provide an adequately detailed assessment of Donahue's mental RFC in accordance with the pertinent regulations.

reliance on an omission effectively shifts the burden back to the claimant." Id.  Moreover, it was within the ALJ's power to obtain more complete information.  Id.  In other words, the ALJ could have asked for further clarification from Dr. Penland or could have ordered an additional consultative examination if the evidence was unclear.

While Dr. Penland's report is not clear with respect to how employable she believed Donahue was based on the psychological testing, she unequivocally states Donahue would have "severe difficulties" in work-related activities.  If the Court were to engage in speculation, this statement might be read to mean all work-related activities. In sum, the Court is unpersuaded that the ALJ could have "accurately dr[awn] conclusions" when Dr. Penland's statements are unclear as to what types of work-related activities might be affected by Donahue's "severe difficulties."  Indeed, the Commissioner's interpretation that Dr. Penland might have envisioned that Donahue would have difficulty securing a job is additional speculation.  [Doc. No. 13, p. 6.]  Nothing in Dr. Penland's report addresses Donahue's possible attempts to secure a job.

Therefore, upon remand, the Court directs the ALJ to conduct a rehearing and reassess Donahue's mental RFC.  In so doing, if a VE is again employed, the hypothetical question should include all of the specific limitations provided by the pertinent physicians or consultative examiners.  Moreover, to the extent Dr. Penland's report or opinions are not clear, the ALJ should further develop the record accordingly.  The ALJ must "make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Dewey v. Barnhart, 178 Fed. Appx. 794, 799 (10th Cir. Apr. 27, 2006) (internal citation omitted).  Even when represented by counsel, the ALJ has an obligation to develop the record sufficiently so as to make the RFC determination.  Id.

Finally, since there were references to another medical doctor who may have treated Donahue for some of her mental conditions with prescribed medications, reports from that doctor should be obtained and evaluated in reaching the RFC determination.

### Conclusion

The Court will remand for a rehearing on the issues discussed above, having concluded that substantial evidence does not support the ALJ's mental RFC finding.  Upon remand, the ALJ must re-evaluate Donahue's mental RFC in light of all of the medical evidence and make appropriate detailed findings that can be used, as necessary, in a hypothetical presented to a vocational expert. The Court should supplement the administrative record as discussed herein.

IT IS THEREFORE ORDERED that Plaintiff's motion to remand for rehearing [Doc. No. 11] is GRANTED and that this matter shall be remanded for further proceedings consistent with this opinion.

Lorenzo F. Garcia
Chief United States Magistrate Judge

27